JS-6

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Zagel | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 638 | **DATE** | 7/30/2001 |
| **CASE TITLE** | PATRICIA PEELE vs. COUNTRY MUTUAL INSURANCE CO. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
  ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry]  **Defendant's motion (25-1) for summary judgment is granted.**

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | Document Number |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | AUG 01 2001 | |
| | Notified counsel by telephone. | | date docketed | 32 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | FILED FOR DOCKETING | | |
| DW | courtroom deputy's initials | 01 JUL 31 AM 9: 35 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

DOCKETED
AUG 0 1 2001

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

PATRICIA PEELE,

    Plaintiff,

v.

COUNTRY MUTUAL INSURANCE CO.,

    Defendant.

No. 99 C 0638
Judge James B. Zagel

## MEMORANDUM OPINION AND ORDER

Patricia Peele brings this age and sex discrimination claim against her former employer, Country Mutual Insurance Company. Defendant moves for summary judgment and the analysis of the issues fits comfortably within the usual employment discrimination framework.[1]

The undisputed facts are as follows.[2] Country Mutual underwrites automobile and homeowners insurance liability policies. The organization is geographically divided into claims districts, each supervised by a District Claims Manager. Within each district are several claims offices, each headed by a Claims Supervisor. This case opens a window into the Grayslake claims office, where, from 1989 until 1997, Patricia Peele worked her way from a Claims Service Representative (CSR) up to a Claims Representative Level II-Field (CRII-Field). The key

---

[1] Summary judgment is appropriate if, evaluating the admissible evidence in the light most favorable to the plaintiff, there is no genuine issue of material fact and Country Mutual is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986).

[2] Thankfully, the parties have complied with Local Rule 56.1, and the relatively narrow scope of their factual dispute is readily apparent.

decisionmakers are Michael Kearns (the District Claims Manager in 1997-1998) and Gary Hanenberger (the Grayslake Claims Supervisor in September, 1997-August, 1998).

In January, 1997, Dennis Bates (the Claims Supervisor at the time) and Kearns promoted Peele, then age 56, to the CR II-Field position. Her responsibilities included investigating complex casualty claims involving comparative negligence, two-car accidents and the like, with field work for accident site investigation and witness interviews. Hanenberger replaced Bates in September, 1997. In their supervisory roles, Bates and Hanenberger gave Peele annual performance reviews using Country Mutual's ranking system. The relevant ranks are, in descending order of quality, "Meets Requirements 3," "Meets Requirements 2," "Meets Requirements 1," "Needs Improvement 2," and "Needs Improvement 1." In addition to these annual reviews, Hanenberger gave employees quarterly performance reviews. Hanenberger also monitored performance by conducting reviews of claims representatives' on-line activities logs (computerized calendars and to-do lists that are used to chart the progress of claims), and providing comments based on his reviews.[3]

Country Mutual had a "Best Practices" goal for customer service. Best Practices included contacting the insured within one hour of a claim, obtaining an appraisal within 24 hours,

---

[3] Peele attempts to dispute the regularity of Hanenberger's reviews with respect to other employees. She states that she did not receive documentary corroboration of Hanenberger's testimony. See L.R. 56.1(b)(3)(B) Response Statement ¶ 27, 29. This is not enough to deny a statement of fact. Hanenberger can testify to his regular practices, documentary corroboration is not required. Citing to a lack of corroboration is not the same as citing to specific evidence that contradicts testimony. Peele does not articulate a reason, such as bad faith destruction of documents, to suggest why the absence of documents means Hanenberger is lying. There is no question that Peele casts Hanenberger as the main villain in this case, but for purposes of creating a record to fend off summary judgment, Peele needs to say more than "Hanenberger is not to be believed." Peele makes similar arguments with respect to other Country Mutual practices (e.g., the regularity of Supervisor Audits), and I agree with defendant that denials based on the absence of corroborating documents are not sufficient.

2

collecting witness statements within 24 hours, and coming to a preliminary conclusion on the claim within 3 days. The computerized "bring ups" calendered the timely handling of claims files, and Claims Supervisors could access a CR's bring ups to monitor compliance with Best Practices. The parties dispute whether Best Practices compliance was a requirement or merely a goal, but as we shall see, that dispute is not material.

I.    Peele's Evaluations and Termination

Peele received an annual performance review from Bates in February, 1996 (when she was a CRI). Bates rated her a "Meets Requirements 2." This was a drop from the previous year, when Peele got a "Meets Requirements 3." Bates criticized Peele's lack of aggressiveness, her slowness in working through a claims file and her failure to comply with Best Practices. About a year later, Bates and Kearns promoted Peele to CRII-Field. In her next annual performance review, Peele slipped again. Bates gave her a "Meets Requirements 1," the lowest level of satisfactory performance. Bates noted shortcomings since Peele's move to the field, made criticisms similar to her last review, and noted that her complaints on claims surveys were the highest in the office.

After Hanenberger took over for Bates, Peele's ratings slipped further. In December, 1997, Hanenberger gave Peele a quarterly review. He said, "she needs to work on keeping the insured informed," she needed "to work on customer service results," and that she must "complete file investigations in a timely manner and meet all Best Practices." In February, 1998 the District Claims Manager and Claims Supervisors conducted a Supervisor Audit of the Grayslake office. Donald Weber, the District Training Coordinator, evaluated Peele's files, noting that several files lacked conclusion letters to the insured and proper investigation. He felt

her files needed more in terms of statements and follow-up investigation. Weber said use of a dedicated bring up system was mandatory and that Peele must use an active bring up system. In March, 1998, Hanenberger gave Peele her annual review. This time, she slipped below the satisfactory level down to "Needs Improvement 2." Like previous reviews and evaluations, the supervisor said (among other file maintenance critiques) that "all best practices must be met and documented," and "all files should be kept on a dedicated bring up system so that files do not go unattended for long periods of time." About two weeks later, Hanenberger wrote Peele a letter saying, "We have discussed your performance several times in the past 7 months and I do not see a marked improvement in your job performance. Although, after we talk it seems to improve for awhile, then your performance tends to drop back below an acceptable level." Hanenberger again cited untimely investigations, the need to keep customers completely informed, use of a dedicated bring up system, proper application of comparative negligence laws, and Peele's low customer service survey results. Finally, Hanenberger said that failure to comply could result in termination.

Hanenberger wrote another letter on May 5, 1998. He acknowledged some improvement but said that customer service and the use of a bring up system continued to be problems. On June 2, 1998 Hanenberger conducted a quarterly performance review. He said there were still files that failed to meet Best Practices. He said that Peele worked hard until Hanenberger said she improved, and then she let her performance slip back. Hanenberger and Kearns discussed Peele's performance. On June 18, 1998, Kearns reviewed her files noting numerous problems (*e.g.*, "this file is a disgrace"). Hanenberger and Kearns sought Human Resources approval to give Peele a

4

Provisional Rating, a final warning; Judy Garee, Manager of Compensation, approved the Provisional Rating.

The Provisional Rating said it was Peele's final warning about proper, timely and meaningful investigations, active bring ups, and proper application of comparative negligence. Peele signed the Provisional Rating, and says that Hanenberger threatened to fire her immediately if she did not sign it. Around August 7, 1998, Hanenberger reviewed 63 of Peele's files and found 10 that did not meet the Provisional Rating requirements. Hanenberger and Kearns decided to recommend termination. Kearns consulted with Garee and Joe Painter, Director of Claims; Garee and Painter approved the termination.[4] On August 14, 1998 Kearns and Hanenberger told Peele she was being fired.

## II. Peele's Point of View

Peele denies that her performance was materially deficient. She does not deny that she received the aforementioned evaluations from her supervisors. Instead, she relies on co-worker testimony that Peele was a satisfactory employee, and on portions of her on-line reviews to suggest that she was performing her job but Hanenberger was too harsh. Dawn Jones, a Claims Support Representative, said she had to do more clerical work on Chris Mason's files than on Peele's. Joyce Harrington, another CSR, said Peele's work was excellent the first time the two worked together, but things changed when Peele's work load increased. Peele's on-line logs

---

[4] In an e-mail to Painter, Kearns said, "I would like to see Pat Peele stay within the organization in some capacity, and perhaps [demoting her to a CSR] is a possible solution to this matter. At best, Pat does a good job on CR1 level work but that position is no longer available to her in Grayslake." Painter replied, "Mike, if Pat's not doing the job, then demoting her is not the answer. I am forwarding your email to terminate her to HR with my approval."

5

document her attempts to contact people, attempts to get police reports, and telephone contacts with various people. Often, these on-line logs include comments from Hanenberger like "1 attempt to contact claimant in 5 days is not meeting BP2," "investigation of this accident is not complete," or "this report should have been picked up and investigation completed."

Peele also notes that other employees had less than stellar performance records. Thomas Kyle was a CRIII who both Bates and Hanenberger criticized for not adhering to his bring up system. He was given a Provisional Rating, and soon thereafter, Hanenberger decided that his files were up-to-date. Hanenberger recommended that Kyle be taken off Provisional Rating. Weber, in connection with a Supervisor's Audit in 1998, criticized Kyle's files; a few months later Weber thought Kyle was doing better. Hanenberger noted that Kyle was doing well but still needed to be more accurate, timely and thorough. Kyle resigned in September, 1998. Hanenberger says he would have recommended termination if Kyle had failed to improve by October, 1998.

Chris Mason came to the Grayslake office as a CRII shortly after Peele's termination. The 1998 Supervisor's Audit revealed some three to five files that lacked some type of documentation. Hanenberger gave Mason a quarterly review on May 14, 1999 and said he needed to work on improving contact with insureds.

Hanenberger hired another CRII, Laura Dempski, in November, 1998 (after Peele's termination). Her first annual review rating was a "Meets Requirements 1." Hanenberger felt her bring ups needed improvement; for the most part she was meeting Best Practices, but she needed to make more contacts with insureds and claimants to meet Best Practices 1 through 3.

Matthew Smith was in Rolling Meadows during the time Hanenberger supervised that office. Smith received a "Meets Requirements 1" in his 1997 annual review. Hanenberger's quarterly review criticized his file documentation, and Weber's 1998 Supervisor Audit noted a "glaring problem" with Smith's files. Kearns and Cheryl Kramer (the Claims Supervisor for the Schaumberg office) put Smith on a Provisional Rating and eventually terminated him for performance reasons.

Hanenberger apparently did not recommend the termination or discipline of Dempski, Mason or Smith.[5] He did not discipline Carolyn Kleckner, age 54, for whom, apparently, no record of performance problems exists. He did recommend the termination of Merill Drake in 1998, age 52, and replaced him with a 36 year-old.

### III. The Voluntary Early Retirement Program

In late 1997, Country Mutual decided to reduce expenses related to claims by reducing the number of claims staff. One method of staff reduction was mandatory transfers of claims employees to offices with openings resulting from attrition; if the employee did not accept the transfer, the employee was terminated. Another method was voluntary early retirement for CSR, CRI, CRII-Office, CRII-Field, and CR-III staffers in Illinois who would be 55 years old by June 30, 1998. Country Mutual announced the voluntary early retirement program (VERP) in December, 1997. Eligible employees were given until February 6, 1998 to notify Country Mutual if they decided to participate. Peele was eligible but chose not to participate. Seventeen other employees also chose not to participate in the VERP. Three of these employees were no longer

---

[5] Hanenberger was no longer Smith's supervisor at the time of his Provisional Rating and termination.

7

with Country Mutual as of March, 1999, but there is no evidence as to the reason for their leaving Country Mutual. Peele asked to participate in the VERP in March, 1998 but was turned down because she was too late.

IV. A "Male" Office

According to Peele, Hanenberger prefers the company of men. Dawn Jones said that Hanenberger and Mason went out to lunch quite a bit. (Jones called Mason the "office brown-noser.") Joyce Harrington said Mason was not up to par at all, but that men "got away with murder" under Hanenberger's command. She complained to Hanenberger about having to do Mason's work for him, and Hanenberger replied, "that's what you're here for so do it." Harrington thinks Hanenberger is a male chauvinist and fostered a "very male-oriented office." According to Harrington, Hanenberger would go out for beers with the other men in the office (accompanied occasionally by the "young and pretty" - Harrington's words - Kelly Wren). Hanenberger and Mason played basketball together after work, too.[6]

IV. Prima Facie Case of Discrimination

Peele's case for age discrimination boils down to this: she was 58 years old when she was fired; Chris Mason was 24 and took a CRII position shortly after her termination; Laura Dempski was 32 when she was hired; Peele was doing fine when Bates was her supervisor; Hanenberger

---

[6] Harrington and Jones can testify that they observed Hanenberger and Mason socializing, going out for beers, and playing basketball. Hanenberger's comment to Harrington is not offered for the truth of the matter (that Harrington was there to do Mason's work) but to show Hanenberger's attitude, and for that purpose is admissible. However, as Country Mutual points out, Harrington's conclusory opinions of chauvinism or "male-orientation" are too broad to raise an issue of differential treatment; the underlying facts are far too innocuous to allow the scandalous conclusions to stand as statements of fact, and I disregard them.

8

held her to a higher standard than younger CRs; Hanenberger fired Drake (age 52); and Country Mutual saved money by firing Peele since it would not have to give her early retirement.

Her case for sex discrimination is similar: she is a woman; Chris Mason, her replacement, is a man; and Peele was performing her job reasonably well.

There is no evidence that Hanenberger, Bates, Kearns, Painter or Garee made age or gender-related comments concerning Peele, so this is not a classic case of "direct" proof of intentional discrimination. Instead, Peele has marshaled what she considers circumstantial evidence of intentional discrimination (mostly on the part of Hanenberger). Whether "characterized as 'indirect' evidence or 'mosaic' evidence, very often the best way to evaluate the plaintiff's case at the summary judgment stage is to use the *McDonnell Douglas* steps." *Robin v. Espo Engineering Corp.*, 200 F.3d 1081, 1090 (7th Cir. 2000) (quotation omitted); see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

In order to state a prima facie case, Peele must show: (1) she was within the protected class (over forty or a woman); (2) she was performing her job to the employer's legitimate expectations; (3) she was fired; (4) Country mutual hired someone younger (or male). Like many cases, there is no real dispute about the first, third and fourth elements of the prima facie test, and I find that Peele has satisfied those elements.[7] And like the mine-run employment discrimination case, this case boils down to the plaintiff's job performance. If Country mutual has articulated a legitimate

---

[7] There is some dispute over the fourth element, whether similarly situated younger or male employees were treated more favorably. However, I give plaintiff the benefit of establishing the minimal burden of a prima facie case by showing that she was replaced by a younger man. The treatment of other employees is, in this case, best examined under the rubric of pretext. As I view the record, Peele suggests that Country Mutual did not honestly believe she was performing poorly because other younger men had similar problems and were not fired.

9

reason for termination (and it has, her performance) then Peele must show that reason was pretextual, a lie. See *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 2109 (2000). Did Country Mutual believe Peele performed satisfactorily, *i.e.*, was Country Mutual lying when it said it was firing her for performance reasons? The second prong of the prima facie test merges with the pretext inquiry in this situation, and it makes more sense to simply proceed to the ultimate issue of pretext in deciding the summary judgment motion. *Roberts v. Separators, Inc.*, 172 F.3d 448, 451 (7th Cir. 1999).

V.  **Performance and Pretext**

In examining Peele's performance, and more specifically, Country Mutual's perception of Peele's performance, I am not to decide whether Hanenberger demanded too much of his workers, but only whether Country Mutual had bona fide expectations that it honestly believed Peele did not meet. *Robin*, 200 F.3d at 1090. I look to Peele's performance as a CRII-Field at the time of her termination, not her performance as a CSR or CRI in years prior to termination. *Karazanos v. Navistar International Transportation Corp.*, 948 F.2d 332, 336 (7th Cir. 1991). Finally, Peele's self-evaluation, or that of co-workers, is not relevant evidence of pretext since "it is the perception of the decision maker which is relevant." *Schaffner v. Glencoe Park District*, – F.3d –, 2001 WL 748076 *4 (7th Cir. 2001) (quoting *Dale v. Chicago Tribune Co.*, 797 F.2d 458, 464-65 (7th Cir. 1986)). Peele must present evidence that Country Mutual did not believe its own assessment of her performance. *Id.*

There is no question that Peele had problems with her bring ups and meeting Best Practices. She does not dispute the factual basis for Hanenberger's (and Kearns's and Weber's)

10

criticisms.[8] This dooms her claim for discrimination. The only evidence that arguably could be used to demonstrate pretext is the performance of other employees. But the undisputed evidence shows that Thomas Kyle was on his way out for reasons akin to Peele, and Matthew Smith was also terminated for similar reasons. Kearns was the District Claims Manager for Peele, Smith and Kyle and there is no evidence that he held them to different performance standards. As for Mason and Dempski, neither had the same volume of criticism over the same amount of time as Peele, and it is therefore difficult to use their personnel records to demonstrate dishonesty with respect to Peele. It is important to note that Hanenberger did not act alone in the decisions; he was subject to Kearns, Painter and Garee.[9] Perhaps Hanenberger could stack the deck against Peele by filling her file with false criticisms, but that is not alleged here. Hanenberger's on-line reviews (*e.g.*, criticizing the failure to get a witness statement despite attempted phone contacts) are factually undisputed. At most, Hanenberger had high expectations, but nothing suggests they were not bona fide or that firmwide standards were different.[10] Some employees did not satisfy Best Practices and they were not disciplined, but Kyle and Smith were.[11] Therefore, it is

---

[8] Even if I were to rely on the co-worker Harrington's assessment, it is clear that she believed Peele's performance deteriorated with the increased work load as a CRII-Field. This testimony does not help Peele.

[9] Indeed the e-mail from Painter, *supra.* at n. 4, is telling. Kearns thought about suggesting an alternative to termination, but was overruled by Painter. Clearly, Hanenberger was but one of a series of decisionmakers in this case.

[10] Merill Drake testified that Hanenberger was a "pusher" and that he "put everybody under a lot of stress."

[11] Peele argues that Hanenberger gave credit to Kyle for improvement and took him off Provisional Rating because he was a younger man. Only after higher-ups noted problems with Kyle, did Hanenberger start criticizing his performance again. There are two problems with this argument that prevent me from making this inference. First, Weber, in a later review, also noted improvements in Kyle's performance following a critique, so Hanenberger may not have been wrong in his assessment. Second, this shows that Hanenberger could not act alone, and in fact, had to be responsive to his superiors' reviews of his Claims Representatives.

undisputed that performance deficiencies were a firing offense at Country Mutual and multiple supervisors believed that Peele, as well as younger men, did not make the grade.[12]

Peele also notes that by terminating her, Country Mutual saved money. This may be true, but there is no evidence that this entered the calculus. It does not change Peele's performance deficiencies, and unless some connection can be made, I have no reason to believe the rejection of the VERP and Hanenberger's criticisms are linked. There are no other employees who rejected the VERP and were fired for performance reasons, so the retirement benefits issue seems to me to be a *non sequitur*.

What of the circumstantial evidence of Hanenberger's chauvinism – the socializing with Mason and comment to Harrington? Nothing ties these incidents to Peele's termination. I do not doubt that Peele and others may have felt excluded from the festivities, but there is nothing to suggest that socializing with Hanenberger was a condition to success at Grayslake. Moreover, socializing after-hours or during lunch with some employees (even if they are young and pretty) to the exclusion of others does not lend itself to an inference that Hanenberger actually believed Peele was performing adequately. Just because Hanenberger did not have beers with Peele does not mean he lied when he evaluated her. In the end, whether Hanenberger lied is the central issue, and I find no trier of fact could reasonably find for the plaintiff.

---

[12] Country Mutual relies on the fact that Hanenberger did not find performance problems with Carolyn Kleckner, a woman over fifty years old, to show that no campaign to discriminate existed at Grayslake. Kleckner may undermine Peele's theory, but the absence of discrimination against one member of a protected group does not, at summary judgment, necessarily evince the absence of discrimination against the plaintiff. It is possible to invidiously discriminate against an older (or female) employee without discriminating against all such employees.

## VI. Conclusion

Defendant's motion for summary judgment [25-1] is granted.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: JUL 3 0 2001